SIGNED THIS: November 28, 2011

_____
**Thomas L. Perkins
United States Chief Bankruptcy Judge**

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| GARY W. SCHARP, | ) | Case No. 11-82359 |
| | ) | |
| Debtor. | ) | |

### A M E N D E D   O P I N I O N

This case involves a dispute between the Debtor, Gary W. Scharp (DEBTOR), and Merlin Corporation (MERLIN), over the interpretation and effect of 11 U.S.C. § 365(h)(1). As explained below, both parties attribute more significance to this provision than it deserves, as it has little to do with the ultimate resolution of their dispute.

**FACTUAL AND PROCEDURAL BACKGROUND**

In 1999 and 2000, the DEBTOR negotiated with MERLIN to obtain a franchise to operate a Merlin's Muffler & Brake Shop. MERLIN granted him a franchise for two locations, one in Peoria and one in East Peoria, both of which he operated for several years. The East Peoria shop was located on property that he owned at 927 E. Washington Street.

In 2000, Merlin Franchising, Inc.(MFI), and the DEBTOR entered into a "Franchise Agreement" granting the DEBTOR the exclusive right to operate a Merlin's shop at the East Peoria location subject to compliance with a standard set of terms and conditions as set forth in the 33 page agreement. As a condition to granting the franchise, MERLIN required that it obtain a leasehold interest in the real estate via a lease and leaseback arrangement.

On August 19, 1999, the DEBTOR and MERLIN executed a document entitled "Lease" granting exclusive tenancy in the East Peoria real estate to MERLIN for a term of 15 years, renewable for 25 additional years, with monthly rent starting at $4,560 and escalating to $7,815 for the 5th renewal term. Subsequently, after construction and/or modification of the improvements to meet MERLIN'S standards, MERLIN and the DEBTOR executed a document entitled "Sublease" that sublet the real estate back to the DEBTOR. The term of the Sublease is identical and runs concurrently with the term of the Lease, including the 5 renewal terms. The monthly rental payment due MERLIN under the Sublease is exactly $200 more than the rental payment due the DEBTOR under the Lease for each rental period.

In March, 2011, the parties entered into a "Release and Reconciliation Agreement," reciting that MERLIN was due $97,600 in unpaid rent and related charges under the Sublease, and that the DEBTOR was due the same amount under the Lease. They effectively agreed to offset and cancel these mutual obligations and stipulated that no defaults existed under either the Lease or Sublease as of March 31, 2011. The Release and Reconciliation Agreement does not refer to the Franchise Agreement.

The Lease makes no reference to the Franchise Agreement, although it requires the improvements and signage to conform to the national standards applicable to Merlin's Muffler & Brake Shops. The Sublease refers to and attaches a copy of the Lease, requires the property to be used as a Merlin's Muffler & Brake Shop, and provides for cross-default between the Lease and Sublease. The Sublease also specifically refers to the Franchise Agreement, providing for cross-default with it.

The Franchise Agreement requires the franchisee to lease or own the business real estate and provides:

> If the FRANCHISEE leases the SHOP from a party other than the COMPANY or MERLIN, or purchases the Premises, it shall lease or sublease the Premises to MERLIN. MERLIN will, in turn, sublease the Premises to Franchisee for the same rent. Par. 4 (A).

The term of the franchise is tied to the term of the Sublease, Par. 1 (A), and cross-default exists between the Sublease and the Franchise Agreement, Par. 14 (C)(4). In addition, the Franchise Agreement in the event of termination grants MFI (referred to as the "Company") the option, exercisable for 30 days, to purchase all assets of the shop and to assume the Sublease. Since the DEBTOR owns the real estate, he was required to:

> [G]rant the COMPANY or the COMPANY's assignee a standard commercial lease for a term of ten (10) years, at a rental rate of eight percent (8%) of the monthly net revenues of the SHOP, plus all costs FRANCHISEE incurs in connection with the payment of real estate taxes, insurance and assessments for the Premises. The COMPANY will have the right to assign this option to purchase. Par. 15 (D).

There is no evidence or allegation in the record that the purchase option was exercised.

On April 1, 2011, the day after the effective date of the Release and Reconciliation Agreement, MFI gave written notice to the DEBTOR that he was past due the sum of

3

$74,284.23 for royalty, service and advertising fees for the East Peoria franchise, demanding payment within 10 days to avoid termination of the Franchise Agreement. The DEBTOR did not pay the amount demanded and the Franchise Agreement was terminated.

On July 29, 2011, MERLIN filed a forcible entry and detainer action against the DEBTOR in the circuit court for Tazewell County, Case No. 11-L-80, seeking to preserve its rights under the Lease but to terminate the Sublease and remove the DEBTOR from possession of the East Peoria property and recover unpaid rent. The DEBTOR answered on August 26, 2011. A similar action was filed in Peoria County with respect to the Peoria shop property.

On September 15, 2011, the DEBTOR filed a voluntary petition for protection under Chapter 7, listing MERLIN on his schedule of executory contracts and unexpired leases as lessor on a lease of the East Peoria shop property and of the Peoria shop property. On Schedule D, the DEBTOR lists F&M Bank as holding a mortgage in the amount of $390,431 on the East Peoria property valued at $370,000. The petition filing stayed the forcible entry actions. A. Clay Cox is serving as the Chapter 7 Trustee (TRUSTEE).

On September 19, 2011, MERLIN filed a motion for relief from the automatic stay in order to continue the prosecution of the forcible entry actions. On September 21, 2011, MFI filed a motion for stay relief, alleging that the Franchise Agreement terminated prepetition, that the DEBTOR continues to operate the East Peoria shop in violation of the Franchise Agreement, and seeking relief from the stay in order to commence an action for an injunction to stop the ongoing violations by the DEBTOR.

The DEBTOR filed a response indicating he had no opposition to MFI'S motion and

4

an order was entered modifying the stay for the purpose requested. Thereafter, on October 5, 2011, MFI filed its complaint in the U.S. District Court for the Central District of Illinois seeking to enjoin the DEBTOR from operating a Merlin's shop or a competing business.

With respect to MERLIN'S motion, the DEBTOR did not oppose the requested relief as to the Peoria property and his attorney signed off on an agreed order modifying the stay to permit the Peoria County forcible entry action to proceed. The DEBTOR continues to oppose stay relief as to the East Peoria property. He asserts that the Lease will not be assumed so that MERLIN'S possessory rights will be terminated. Anticipating MERLIN'S reliance on section 365(h)(1)(A), he contends that provision is inapplicable because the Lease was part of a "single integrated transaction" with the Sublease and Franchise Agreement, both now terminated. The DEBTOR argues that the effect of these circumstances is that the Lease is not a "true lease," is not covered by the provisions of section 365, and, therefore, MERLIN is not accorded rights under section 365(h)(1). He states that if the Court determines that section 365(h)(1)(A) does not apply, there will be no possessory right for MERLIN to enforce in state court, so that stay relief as to the East Peoria property should be denied.

Although MERLIN, in its brief, accurately describes the purpose behind section 365(h), it fails to address the DEBTOR'S primary argument, that the Lease is not a "true lease" and that section 365 *in toto* is inapplicable. MERLIN states its intent to remain in possession of the East Peoria property, to evict the DEBTOR or whomever is presently occupying the premises, to replace the DEBTOR with another franchisee of its choosing, and to continue to realize the benefits of its tenancy under the Lease for the stated term

5

thereof. MERLIN argues that section 365(h) gives it the right to do exactly that, notwithstanding that the DEBTOR, as the owner of the property and as its lessor, no longer wants to lease the property to MERLIN now that his franchise has been terminated.

The F&M Bank has moved for relief from the automatic stay, not to foreclose its mortgage, but to exercise an assignment of rents conveyed by the DEBTOR, so that it will receive the rent due from MERLIN under the Lease. No objections to the motion were filed and the requested relief has been granted.

## **ANALYSIS**

When a creditor moves for stay relief to commence or continue a lawsuit, the first point of inquiry is whether the purpose of the suit is to collect a prepetition debt that has been or might be discharged in the bankruptcy case. Where the purpose of the suit is to enforce an interest in property, real or personal, the court should determine whether the property interest is one that is avoidable by the debtor or the trustee or that may otherwise be cut off by provisions of the Bankruptcy Code. *See In re The Ground Round, Inc.,* 482 F.3d 15, 19 (1st Cir. 2007) (property right survives bankruptcy and remains enforceable unless cut off by a Bankruptcy Code provision). If an unavoidable property interest is at issue, the focus turns to whether the debtor proposes to somehow deal with that property interest in the context of the rights and powers given to the debtor in the applicable chapter of the Bankruptcy Code. If not, the next point of inquiry is whether the creditor has a colorable claim to the non-debt collection, non-bankruptcy related relief sought in the lawsuit. *Matter of Vitreous Steel Products Co.,* 911 F.2d 1223 (7th Cir. 1990). If so, stay relief should be granted.

The last two points operate in tandem as a forum selection mechanism, determining

6

whether the matter will be resolved in or outside of bankruptcy. The bankruptcy court should be mindful that a motion for relief from the automatic stay is heard as a contested matter, not an adversary proceeding, in the nature of an expedited, summary proceeding that is not intended to resolve the merits of underlying claims or disputes. *Id.* at 1234; *In re Mullarkey,* 536 F.3d 215, 226-27 (3rd Cir. 2008); *Grella v. Salem Five Cent Sav. Bank,* 42 F.3d 26, 31-33 (1st Cir. 1994). Despite the fact that stay relief motions are largely procedural motions that are intended to be resolved as summary proceedings, the parties are requesting that this Court resolve, in the context of a stay relief motion, a novel and complicated issue of state contract and real property law that will determine their respective rights in a certain parcel of real estate for the next 30 years.

Generally, while a debtor may use a bankruptcy case to get out from under an unfavorable lease where the debtor is the lessee, where the debtor is the lessor he is often stuck with the tenant. While the lease may be rejected, rejection does not effect its cancellation, and no Bankruptcy Code provision empowers a debtor-lessor or its trustee to avoid or strip off an unwanted lease. A non-debtor tenant's rights under unexpired leases have been protected against that very result since before the Bankruptcy Code was enacted. Bankruptcy Act, section 70b; *In re Taylor,* 198 B.R. 142 (Bankr.D.S.C. 1996). Although the statutory language has been modified on several occasions, the concept of protecting a tenant's leasehold estate has been part of the Bankruptcy Code since its inception without interruption. *See* Robert M. Zinman, *Precision in Statutory Drafting: The Qualitech Quagmire and the Sad History of Section 365(h) of the Bankruptcy Code,* 38 J. Marshall L. Rev. 97 (2004).

Under section 365(h), once a lease under which the debtor is the lessor is rejected,

7

the tenant has a choice. The tenant may treat the lease as terminated, vacate the premises without liability for future rent, and may assert an unsecured claim for damages resulting from the lessor's breach. 11 U.S.C. § 365(h)(1)(A)(i); *In re Milstead,* 197 B.R. 33 (Bankr. E.D.Va. 1996). Alternatively, if the tenant wants to retain possession of the property, he may do so. The statute expressly provides that:

> [T]he lessee may retain its rights under such lease . . . for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.

11 U.S.C. § 365(h)(1)(A)(ii).

A rejection of a lease does not cancel or terminate it. *In re Miller,* 282 F.3d 874, 878 (6th Cir. 2002). Despite rejection, an unexpired lease continues and may be honored or repudiated by either party. *Id.* The primary effect of rejection is to abandon the lease from the estate so that it reverts back to the debtor's control outside of bankruptcy. *In re Rosenfeld,* 23 F.3d 833, 839 (4th Cir. 1994). Assumption and rejection are bankruptcy concepts that determine whether the estate will administer the lease; rejection merely removes it from property of the estate. *Stoltz v. Brattleboro Housing Authority,* 259 B.R. 255, 258 (D.Vt. 2001).

In a Chapter 7 case, the right to assume or reject an unexpired lease resides exclusively with the trustee; the debtor has no authority or standing to do so. *In re Metro,* 2008 WL 1348665 (Bankr.E.D.Pa. 2008); *In re Gatea,* 227 B.R. 695 (Bankr.S.D.Ind. 1997); *In re Rodall,* 165 B.R. 506 (Bankr.M.D.Fla. 1994). What is to be made of the TRUSTEE'S failure to reject the Lease and to rely instead on his abandonment of the Lease and of the East Peoria real estate? Little, if anything. Because rejection and abandonment both have the

8

effect of removing a lease from property of the estate, *In re Reed,* 94 B.R. 48, 52 (E.D.Pa. 1988), treating a trustee's abandonment the same as if he had rejected the lease, for purposes of administration of the estate, is sensible.  It could be that the TRUSTEE accepts the DEBTOR'S argument that the Lease terminated prepetition along with the Franchise Agreement and the Sublease, so that there was no unexpired lease that could be assumed or rejected, although, admittedly, his opinion of that argument is not material.

But assuming as the parties seem to, that the TRUSTEE'S abandonment equates to a rejection that served to trigger section 365(h)(1)(A), what effect does that provision have on the ability of MERLIN to retain its Lease rights and on the DEBTOR'S ability to cut off those rights?  And since this issue is presented in the context of a motion for relief from the stay to proceed in state court, what is the proper division of adjudicative responsibility between this Court and the state court?  This fundamental issue of forum selection is always present when stay relief is sought to litigate outside of bankruptcy.  *See In re Pro Football Weekly, Inc.,* 60 B.R. 824 (N.D.Ill. 1986).

MERLIN concedes that the Lease, the Sublease and the Franchise Agreement are different parts of a single business transaction, the goal of which was to allow the DEBTOR to obtain and operate a Merlin's Muffler & Brake Shop franchise at the East Peoria property that he owns.  The DEBTOR goes beyond that, arguing that the three contracts are so dependent on each other, that the termination of the Franchise Agreement and the Sublease defeats the business purpose for the Lease and renders it unviable as a stand-alone agreement. Presenting it as an issue of bankruptcy law for this Court to decide, the DEBTOR says that the integrated relationship among the three contracts means that the

Lease is not a "true lease" for purposes of section 365.

This presentation has some surface appeal, if for no other reason than that bankruptcy courts are well familiar with having to determine whether a contract labeled "lease" is in substance a mechanism to finance the "lessee's" ultimate acquisition of an ownership interest, a "disguised sale" that is dressed up to look like a lease. A creditor who is party to a disguised sale transaction is stuck with the lesser rights of a secured lender rather than the more favorable treatment accorded in bankruptcy to a party to a true lease. The DEBTOR'S theory also garners general support from the Illinois Supreme Court which recognizes a "long-standing principle that instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction are regarded as one contract and will be construed together." *Gallagher v. Lenart,* 226 Ill.2d 208, 223, 874 N.E.2d 43, 58 (2007).

The true lease analysis in bankruptcy has been well-defined by the Seventh Circuit Court of Appeals. Whether a lease and leaseback arrangement was a true lease or a disguised security agreement was at issue in a bankruptcy appeal in *In re United Air Lines, Inc.,* 447 F.3d 504 (7th Cir. 2006). To fund improvements at its facilities in the Los Angeles International Airport, United entered into a transaction with a public entity, RAIC, that was authorized to issue tax-exempt bonds. United, as lessee of its airport space, assigned a portion of its leasehold to RAIC in exchange for the issuance of the bonds. RAIC then leased back to United the proposed improved facilities with the term and rent payment tied to the bond payouts. In its Chapter 11 plan of reorganization, United sought to characterize the transaction as a secured loan rather than a true lease.

10

First addressing whether the form of the lease agreement should be controlling, the court determined that substance trumps form for purposes of section 365, reiterating its earlier holding that the genuine nature of a transaction will prevail over the titles and terms used, as a matter of federal law. *Id.* at 506, citing *United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609 (7th Cir. 2005). Next addressing whether federal or state law governs the lease-versus-loan determination, the court again reiterated what it had decided earlier, that state law controls, putting the issue in the proper context by quoting from its earlier opinion the reference that "the states have devoted substantial efforts to differentiating leases from secured credit in commercial and banking law." 447 F.3d at 507.

The court proceeded to analyze United's transaction with RAIC under California law, concluding that the transaction was not a true lease for purposes of section 365, but was properly characterized instead as a secured loan transaction. Among other things, the court emphasized its finding that United's rent payments were not intended to compensate RAIC for the use of the facilities based upon a fair rental value, but rather were intended as reimbursement for the cost of borrowed funds.

Following the analytical road map laid out by the Seventh Circuit, this Court first recognizes that whether a transaction is a lease subject to section 365 is a question of federal bankruptcy law. It should be noted that "lease" is not a term that is defined in the Bankruptcy Code. Second, since property rights are at issue, bankruptcy courts must look to state law to supply the rule of decision. If the DEBTOR was asserting the theory that the transaction with MERLIN was a disguised secured loan, the analysis would proceed in a fashion similar to that used by the Seventh Circuit in *In re United Air Lines, Inc.* The disguised sale theory, however, is *not* being advanced by the DEBTOR.

11

Since the DEBTOR already owned the fee simple interest in the East Peoria real estate, his transaction with MERLIN could not have given him any greater property rights than he already had. The transaction did not finance his acquisition of the property. Neither did MERLIN finance the improvements to the building required as a condition of awarding the franchise; F&M Bank did. The DEBTOR is not claiming the transaction was a disguised sale and the facts clearly would not support such a claim.

So what exactly is the DEBTOR'S theory? The position stated in his brief is summarized as follows. The three contracts embody a single integrated franchise relationship. Even though MERLIN "leased" the property, it never took physical possession of the property and leased it back to the DEBTOR at virtually the same rental rate. The DEBTOR characterizes the "lease component of the composite agreements" as "an additional default protection provision" to protect the franchise arrangement. The DEBTOR contends that the Lease was not a "bona fide attempt to create a right of possession" in MERLIN (or MFI) and was therefore not a "true lease" within the scope of section 365.

The DEBTOR does not argue that his "not a true lease" theory fits within a broader fact pattern that has been developed or recognized by Illinois courts, such as the disguised sales arena. At least for Illinois courts, his theory appears to be a novel one. *Cf. In re Harrison*, 117 B.R. 570 (Bankr.C.D.Cal. 1990) (gas station leases that were part of franchise relationship were integrated with dealer agreement and, as such, were not true leases). In support of his position, the DEBTOR relies upon *Matter of Tak Broadcasting Corp.*, 137 B.R. 728 (W.D.Wis. 1992), and *U.S. Bank Nat. Ass'n v. United Air Lines, Inc.*, 331 B.R. 765

(Bankr.N.D.Ill. 2005). Both of these cases, however, involved transactions that were determined to be disguised sales, an argument that the DEBTOR cannot make with respect to his transaction with MERLIN. The DEBTOR'S theory, a very different one, does not appear to have been adopted by any Illinois court or federal court applying Illinois law. The absence of Illinois authority is critical since the term "lease" under section 365 is defined by reference to state law.

To the extent that the DEBTOR invites this Court to adopt a novel theory of Illinois common law without any supporting decisional authority, this Court respectfully declines that invitation. The Court is mindful of the strong public policy of freedom of contract in Illinois where private parties are generally permitted to contractually arrange a commercial relationship in whatever manner they wish. *Speed District 802 v. Warning,* 242 Ill.2d 92, 157, 950 N.E.2d 1069, 1106 (2011). In addition, federal courts, when asked by a litigant to create or expand upon a substantive state law claim or defense, are loathe to engage in the speculation that such a request entails. *Great Cent. Ins. Co. v. Insurance Services Office, Inc.,* 74 F.3d 778, 786 (7th Cir. 1996).

The true lease issue almost always comes up in the either/or context of a contract or transaction being a lease that must be assumed with defaults cured under section 365 or a disguised secured transaction with the debt subject to modification and reamortization under a plan of reorganization. In this context, the true lease issue has a long, well-defined history that presents a clear choice between two mutually exclusive options that entirely occupy the field. It is either a true lease or a secured transaction, but it can't be both and

13

it must be one or the other. Fundamentally, the true lease contest serves as a mechanism to recharacterize an instrument to conform to its substance rather than its title or form. But the DEBTOR is not seeking to recharacterize the Lease as, in substance, a different kind of instrument. He is attempting to nullify it.

The DEBTOR cites no reported opinion applying Illinois law that holds that a lease that is not a true lease is therefore terminated or terminable at the "lessor's" election. The DEBTOR may have improperly framed his theory as a true lease issue. The DEBTOR'S desire to treat the Lease as void or cancelled is more properly characterized as seeking the imposition of an implied condition, that if his franchise rights are terminated then, likewise, the Lease is terminated. Whether such a condition should be implied is purely a question of Illinois law.

The DEBTOR needlessly worries that section 365(h)(1)(A)(ii) grants MERLIN a substantive "bankruptcy right" of possession that trumps state law to the contrary. It does not. That provision clarifies the long-standing principle that a landlord's bankruptcy cannot be used to cancel, avoid or terminate a tenant's leasehold estate. Neither the bankruptcy case itself nor rejection under section 365 alters the substantive rights of the parties to the rejected lease. *In re Flagstaff Realty Associates,* 60 F.3d 1031, 1034 (3rd Cir. 1995). Section 365(h) preserves certain tenant rights but it does not enhance them. *In re MMH Automotive Group, LLC,* 385 B.R. 347, 366 (Bankr.S.D.Fla. 2008). The lease passes through the bankruptcy proceeding largely unaffected by it.[1]

---

[1] Rejection of a lease in bankruptcy, does serve to relieve the debtor-lessor of the duty of future performance of the lease covenants, while permitting the lessee the right to offset damages from the lessor's failure to perform the covenants against the obligation to pay rent. 11 U.S.C. § 365(h)(1)(B); *In re Chestnut Ridge Plaza Assoc., L.P.,* 156 B.R. 477, 481 (Bankr.W.D.Pa. 1993); *In re LHD Realty Corp.,* 20 B.R. 717, 719 (Bankr.S.D.Ind. 1982).

14

The statute very carefully qualifies that "the lessee may retain its rights under such lease . . . to the extent that such rights are enforceable under applicable nonbankruptcy law." 11 U.S.C. § 365(h)(1)(A)(ii). As indicated above, this provision preserves but does not enhance a tenant's rights, which are defined by state law. If the circumstances are such that the tenant would have lost its tenancy under state law, the intervening bankruptcy of its landlord does not not alter this result.

The DEBTOR'S argument is that once the franchise terminated, the Lease was no longer enforceable under applicable nonbankruptcy law, in this case, Illinois law. If the DEBTOR was attempting to reorganize, whether the Lease was or was not still enforceable under Illinois law, might have been an issue related to the bankruptcy case. Because the DEBTOR is liquidating in Chapter 7, and the TRUSTEE has abandoned the real estate, resolution of the issue will not have any effect on the administration of the estate. Therefore, this Court should simply pass it off to the state court, which is what granting MERLIN'S stay relief motion would accomplish.

It bears emphasizing that the DEBTOR'S bankruptcy filing did not effect a termination of or a breach under the Franchise Agreement. It is undisputed that the Franchise Agreement was terminated prepetition and was not an executory contract that was subject to assumption or rejection in bankruptcy. This important fact further supports the conclusion that this bankruptcy case has little effect on the rights of these parties. If, under state law, the termination of the Franchise Agreement operated to terminate MERLIN'S tenancy rights, that state of affairs existed before this bankruptcy case was filed. If the bankruptcy case had never been filed, the DEBTOR could have raised that argument

15

by way of defense to the forcible entry action (and he still can) and the state court would have determined it (and it still should). The automatic stay temporarily stalled that proceeding, but the DEBTOR'S decision to file a Chapter 7 case, and the TRUSTEE'S decision not to assume the Lease but to abandon the East Peoria real estate, make the resolution of MERLIN'S future tenancy rights one for the state court. The parties' efforts to shoehorn the issue into bankruptcy court under the guise of section 365(h)(1) are misguided.

**CONCLUSION**

The DEBTOR frames his argument that the Lease is not a true lease for purposes of section 365 as a defense to MERLIN'S stay relief motion. Whether an agreement labeled as a lease is not a true lease under section 365 is a question of federal law that is determined by reference to state law. The DEBTOR cites no Illinois caselaw that would support a finding that a lease is not enforceable as a lease when it is part and parcel of a franchise agreement that has been terminated where none of the related documents provide that the lease will terminate when the franchise does.[2] Accordingly, this Court determines that the Lease is a true lease as a matter of federal law for purposes of section 365.[3]

This Court's determination, however, is limited to sections 362(d) and 365 of the Bankruptcy Code. As such, this decision should have no preclusive effect on the Tazewell County Circuit Court. *See, Matter of Vitreous Steel Products Co.*, 911 F.2d at 1234. Out of

---

[2]The lack of caselaw does not necessarily reflect a lack of merit to the DEBTOR'S argument. The DEBTOR makes a strong case that his ownership interest would be unduly impaired if the Lease were allowed to stand for the remainder of its term plus five renewal terms, despite the termination of his franchise rights. *See In re Buffets Holdings, Inc.*, 387 B.R. 115 (Bankr.D.Del. 2008) (on a motion to assume commercial leases in a Chapter 11 case, applying Illinois law to the question of whether leases were divisible or were part of an indivisible transaction, determining that severability depends on the intent of the parties).

[3]Even if the Lease was determined to not be a true lease, stay relief may nevertheless have been properly granted, since the DEBTOR is not seeking to reorganize the muffler shop business or the East Peoria real estate in this bankruptcy case, and admits to being under water and in default on the mortgage.

16

respectful deference for the authority of the circuit and appellate courts of Illinois to develop the common law of this state, this Court has declined the DEBTOR'S request to adopt what is presented as a matter of first impression under Illinois law, effectively deferring that issue for a *de novo* determination by the Tazewell County Circuit Court in the pending forcible entry and detainer action.

MERLIN'S motion will be granted to allow it to continue the prosecution of the forcible entry and detainer action. In that action, the DEBTOR may raise the exact argument he raises here, that the Lease is no longer enforceable. That question should be determined by the state court as a matter of Illinois law without regard to section 365(h) of the Bankruptcy Code and indeed without regard to the DEBTOR'S bankruptcy filing.[4]

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###

---

[4] It should be noted that section 365(h)(1)(B), not at issue here, grants a lessee the right to offset against the rent, expenses incurred as a result of the debtor-landlord's nonperformance of a rejected lease. This right of offset is one that tenants already enjoy under Illinois law. A landlord of a rejected lease may, of course, elect to continue to perform his duties, and earn the full rent.